Good morning, Mayor and Police of the Court. My name is Emmeline Hart-Bieberfeld, representing Appellant Theodore Moline. I intend to reserve three minutes for rebuttal. This is a 1983 civil rights case against the City of Castle Rock, a number of its police officers and emergency medical personnel that the District Court dismissed on summary judgment on the basis of qualified immunity. When the Court reviews the evidence in the light most favorable to Mr. Moline, as it must, the Court will conclude that summary judgment is not appropriate because Mr. Moline has established a genuine issue of material fact that precludes summary judgment. Let me just ask you, Counsel, since your time is limited, how can we find that the law clearly prohibited the officers' actions when other circuits, although our circuit has not acted, justify the seizures under the community caretaking functions? How can we say it was clearly established? Well, Your Honor, I think what is clearly established is the fact that individuals have a constitutional right to be free from unreasonable searches and seizures. They have a right to be free from unwanted medical attention, and they also have the right to be free from the use of excessive force. In this particular case, the City's essentially entire argument is based on community caretaking function. And the question becomes, when you look at the surrounding circumstances, whether a reasonable officer in those circumstances would have known that they were dealing with a highly intoxicated person that was so intoxicated that he did not have the mental capacity to determine what medical treatment was appropriate for him. Well, go back to the seizure itself, not the medical treatment. How is it clearly established in the law that this seizure would be unconstitutional? And we have to find that, don't we? Yes, we do. And the seizure is unconstitutional in the sense that you have the right to It's a 14th Amendment right. It's essentially a due process argument, but it's also related to the Fourth Amendment. You have a right to be free from a seizure. In this particular instance, the initial contact with the police was not a seizure. We agree that the initial response to the 911 call was a hallmark of the community caretaking function. What we're saying is that the City exceeded its caretaking functions when it attempted to prohibit Mr. Moline from returning to his home and to disengaging from the officers in attempting to enforce unwanted medical treatment on him. Does a person who is two days or intoxicated I'm sorry, Your Honor, I didn't hear the first part of it. If a person is two days or two intoxicated to be cognizant of his own medical condition, does he have the same right to refuse treatment as an ill patient who is fully cognizant of his or her state? He'd had a number of beers. He was clearly intoxicated. Does he have the same right to refuse medical attention when it's apparent? Your Honor, I guess I would respectfully disagree that he was, that there was any evidence that he was entirely, highly intoxicated or manifesting symptoms of extreme intoxication. What the evidence shows is the officer's claim that he was intoxicated based on the fact that he smelled of alcohol. Officer McNew testified that he had slurred speech. But on the opposite side, Mr. Moline presented evidence that he wasn't manifesting symptoms of intoxication. He had several witnesses that essentially supported his contention that he was not slurring his speech. Mr. Moline said that. His expert said that in the record. Witness Dutter said that. And so I guess I disagree with the initial contention that he was highly intoxicated. Well, look, you've got a paramedic there, as well as the officers who are pretty good at this sort of thing, looking at a guy who has just fallen into a pit and practically impaled himself on a stick with a hole in his chest that appears to be asynchronous with his breathing. And the man could die. And he admits to having had a considerable number of beers. And the officers could reasonably conclude, based on all of the totality of the evidence, that he just didn't appreciate the seriousness of what could be, could be a life-threatening situation. Now, what's so unreasonable about that chain of thinking? You know, again, it goes back to a material disputed fact, which is his level of intoxication. No, it doesn't. No, it doesn't. Because what counts is what the officers and the paramedics perceived. And they perceived a person. And I'm saying, what's unreasonable about perceiving a person who's just gone through all of that and who looks to be seriously injured, nevertheless saying, ah, I'm fine? I mean, that's, there's not a, I mean, what's unreasonable about their conclusion that he was too blotto to realize that he was actually in serious trouble? Could be in serious trouble. Well, it goes, I think, to the community caretaking function. There's a balancing that has to be done. You have a right to be free from the medical treatment. The officers do have an obligation to assist someone that's in need of routine health care. In this situation, most, Mr. Moline was cognizant. There was no evidence that he was incoherent, that he was mumbling. He was engaging the officers and insisting that I'm okay, I don't need help. If there's a medical waiver form, I want to sign it so that I can return to my home. When he attempted to return to his home, that's when Officer McNew seized him and attempted to enforce, attempted to force the unwanted medical treatment on him. And what would he have done had they said, okay, we're out of here, and he gone, like that? Well, first of all, you know, there's a protocol in Cowlitz County that essentially dictates that if the police or emergency personnel respond to a scene and there's someone that requires medical aid, that they are to essentially determine whether that person needs medical aid and if they want to be treated. And there are provisions that they are to follow. No, no, that's the question, is what would have happened had the officer said, okay, we're out of here, and they turn and leave, and the next second the guy collapses, because his lung has collapsed. I mean, then you're representing that there would be no problem with that whatsoever at all in terms of a law enforcement officer's potential liability. First of all, Your Honor, that's not what happened here. But what we're saying is that the protocols dictated by Cowlitz County required them to provide him with the release to refuse medical treatment and a procedure by where they were supposed to be calling in to their own medical center to determine how best to deal with him. And in fact, there is a box on the form that enables them to release him to the care and custody of a friend or family member. Ralph Heidman was Mr. Moline's friend and roommate. There's evidence in the record that he was willing and able to assist Mr. Moline if he did in fact need medical attention after he refused it. Your Honor, I see that my time is just about up, and I would like to reserve the remaining time for rebuttal. Thank you, Your Honor. I'm John Kibler on behalf of the City of Castle Rock and its police and emergency medical officers. My clients in this case were sued for trying to care for and look out for what they believed were the best interests of the plaintiff in this case. But here he had not committed a crime. How is it reasonable to draw a taser gun to prevent him from entering his own house? Well, the evidence was that the officer perceived him to be aggressively coming at the officer at the time that he raised the taser gun. And that was the reason. The officer was doing it for his own protection. It was to guard against any aggressive behavior from Mr. Moline. And as soon as Mr. Moline stopped, then he holstered the taser. So that never came of anything. And in fact, I think one of the witnesses that the plaintiff submitted said he just kind of laughed at that and he thought it was funny that the taser was pulled. So really, I don't think that that ever went anywhere, and there never was any actual use of force there. The community caretaking function, though, does involve the right of police to seize for purposes reasonably related to their community caretaking function. That means that it's lawful to have a seizure commensurate with the job that they're trying to do, a stop to investigate whether or not care needed to be taken here. And that's constitutional under the community caretaking function. So the police wouldn't be able to take out their, to do their job, to check and ask whether or not, you know, to try to investigate whether he had the status, what was the extent of his injuries, if they couldn't stop him to ask him. If he just walked away, they wouldn't be able to perform that function. And that's why I think that that level of a seizure is appropriate when you're exercising this duty. Mr. Kugler, is it your view that everything that happened here proceeded under the community caretaker function, or was there an escalation into something else that provided probable cause to take different steps? Absolutely, there was an escalation here. I think there was the first aggressive step where the taser was pulled, and then he just stopped. And then there was the attempt where Mr. Mullane, for a second time, tried to push himself, or looked like he was going to try to push himself and force himself past the officer. He admits raising his arm and walking straight at the officer. The officer took that as an aggressive matter, aggression towards him, and that's when they took him to the ground and got into struggle and arrested him for the assault. Is there any element of excessive force with that? He had a man, an older man, five years, chest in bad shape, perhaps a little less force might have been in play, but is that under qualified immunity? Is that something we concern ourselves with? Well, under Graham v. Connors, the officers are entitled to use a reasonable level of force necessary to overcome what's coming against them. In this case, the perception is aggression, a person coming at me to hit me or strike me or push their way through me, the officer can restrain that. And it took physical force on this guy. And you can tell from the facts, he continued to struggle. When they tried to put the lock on him and take him to the ground, they fought him, they resisted him at every level, and the officer got struck in the face in the middle of this. And I know that that's disputed by Mr. Mullane, but that is the reason why he was arrested. The police had probable cause to arrest him at that point. It doesn't matter that he denied it. They don't have to prove he was guilty to have probable cause. The officer's own observations of him striking the officer was enough to establish probable cause. So I think that the level of force here to get him under control to accomplish the rest, I don't think there was any force that was excessive in this case. There's clear evidence of him resisting. They're entitled to overcome that resistance. They attempted locks, holds, trying to get his arms behind him to handcuff him. When that didn't work, they threatened OC spray. That didn't work. Then they used it, and that's what allowed them to overcome. And actually, the OC spray was beneficial here because it allowed them to stop this struggle. People can get hurt in these kinds of physical struggles. So it was not by any means unreasonable to do that under the best circumstances in this case. The court asked a question, how can we find that there was any clearly established law that the officer's conduct was unconstitutional in this case? And I think the answer to that is you can't because there isn't any law, and the appellants here conceded that there isn't any case law under the facts and circumstances of this case that would have put the officers on notice that what they were doing was clearly prescribed or prohibited by the Constitution. And without that, the officers are entitled to qualified immunity. They have a duty to look out for this guy's best interests. They have a duty not to just accept his denial of saying I don't want medical treatment when he's admittedly consumed at least five beers that afternoon. So they, knowing that duty, knowing their right to stop him, to ask him questions, to make those assessments, and even to take him into protective custody if they felt it was necessary, it was reasonable for them to believe that the actions that they took in this case were lawful. There was one other issue here. Under Washington law, if someone's disabled by alcohol, they're supposed to take them to an approved treatment center. Here, they attempted first aid on their own and then just took them to a local hospital. Well, I think that that is actually a narrower interpretation of that statute than I think is fair. The statute is an all-encompassing statute that's very broadly worded for the persons who are disabled by intoxication. And if you look at the language of that statute, it does provide for, you know, these 60-day programs for people who are alcoholics and substance abusers. And that obviously is not the situation we have here. But it's more broad than that. It goes on to provide for the emergency care of persons who are intoxicated and who are gravely disabled as a reason for that. And the definitions of those gravely disabled include that they're unable to take care of their own health and safety by reason of their intoxication. And that's exactly what we had here. Now, there isn't any evidence in the records that the hospital emergency room wasn't an approved treatment program. That statute specifically provides for emergency care to persons who are intoxicated and unable to care for themselves. And the hospital emergency rooms are where you take people for that. The appellants have alleged, well, that wasn't, you know, an alcohol treatment program. But they haven't done anything to establish in the record that the hospital emergency room isn't an approved treatment program, isn't an approved program for emergency care. In fact, I think they had in a footnote here that the hospital that it was taken to is kind of the place in the region. This is a small community, Castle Rock. It's not a major metropolitan area. This is the regional health care facility where people go when they need medical assistance. And there just isn't anything in the record that says that taking him to the emergency room, which is exactly where he needed to be for the conditions and the assessment that he needed to see if he had any internal injuries. And I think the statute is broad enough to cover that. Thank you. So now that we've kind of addressed the officers and the EMTs who were actually at the scene in addition to that, we had the fire chief and the police chief and the city itself that were sued here. The appellants never presented any evidence at all in support of any claim upon which they could be liable. And obviously, without a constitutional violation, there is no basis for liability of those people. So they were properly dismissed as well. Oh, there was one other thing I wanted to comment upon is the appellant has referenced the Cowles County protocols quite a bit and tried to make argument from there. But the real issue here is whether or not the Constitution prescribed or prohibited the contact, the conduct of the officers here. It's not whether or not the protocols did or not. The protocols may have procedures and things that go on above the minimum constitutional protections. So the issue is whether or not the Constitution was violated, not protocols. But if you read those protocols, those protocols clearly, I think they've been misinterpreted by the appellants. They say, the officers that instruct them, you can't just rely on a refusal of transport or medical care by somebody when there's evidence of intoxication or incompetence. You've got to do a screening. And if you think that they are not making proper decisions for themselves by reason of their alcohol or intoxication, you have specific authority to take them into protective custody to use police and to use reasonable force if necessary. So there's an additional basis for why the officers could reasonably have believed that what they did was constitutional. Thank you. Okay. Thank you, counsel. Ms. Hartley-Rothfeld. Thank you, Your Honor. Briefly, just two points on rebuttal. The first, with respect to Judge Nelson's question about the use of the taser, I believe counsel said that Mr. Officer McNew drew his taser because he felt threatened. But when you review Mr. Officer McNew's report at Record 61, there's no evidence even made to the taser or that he felt threatened by Mr. Moline, and that's, in fact, why he drew the taser. Second of all, Witness Detter is the one that acknowledges that, in fact, it was McNew who started the aggressive posture by touching Mr. Moline first. That's in the record at 145. In addition, there's no evidence that, in fact, it was Mr. Moline that actually hit Officer McNew. Detter testifies at 143 to 145 that, in fact, he did not hit Officer McNew. Officer Queen's statement simply says that McNew told me he was hit by Moline, but Queen didn't observe it. Ralph Heidman also indicates that he did not see Mr. Moline strike Officer McNew. And the declarations that Officer McNew and Officer Queen wrote to follow up their reports are rather inaccurate in the sense that Officer McNew states in his report that Moline was walking towards him swiftly with a swift stride. And yet his declaration written many months after the fact now indicates that he was walking swiftly in an aggressive manner. Also makes reference to the fact in his declaration that Mr. Moline was in an aggressive stance, in a fighting stance. That's not in his report. It's not witnessed by any witnesses at the scene. The second issue is with respect to the Approved Treatment Center in reference to the involuntary treatment statute. Analysis of the state statutes in this case is essentially a legal irrelevancy in the sense that you can't use a state statute to deprive someone of a federally protected constitutional right. With respect to the statute, it specifically states that the person has to be taken to an approved treatment facility. A facility is defined as a place operated primarily for the treatment of alcoholism. There's no evidence that St. John's Emergency Room is for treatment of alcoholism. But did you submit any evidence that it didn't treat alcoholics? The record indicates that he was taken to the emergency room. He was treated in the emergency rooms for the abrasions to his chest. There was nothing that indicates he was treated for alcoholism. And, in fact, St. John's is not an alcoholism center. No, that wasn't my question. My question was, did you submit any evidence that the emergency room does not treat people with problems with alcohol? Not that specifically, no, Your Honor. Thank you. Essentially, the city's interpretation distorts the underlying purposes of the involuntary treatment statute to create, which is to create a non-criminal method for dealing with alcoholics and drug addicts. That's simply not, Mr. Moline, the evidence doesn't support it. At this point, we ask the court to reverse the summary judgment dismissed on qualified immunity grounds and grant Mr. Moline a trial on all issues. Thank you. Okay, thank you, counsel, both of you. The matter just argued will be submitted.
judges: Nelson, Rymer, Beam